# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0690V

| | |
|---|---|
| BASE-MARTHE CLAIRMY,<br><br>　　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: December 1, 2025 |

*Laura Levenberg*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Mary Eileen Holmes*, U.S. Department of Justice, Washington, DC, for Respondent.

### **FINDINGS OF FACT AND ORDER TO SHOW CAUSE**[1]

　　On January 12, 2021, Base-Marthe Clairmy filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act").[3] Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving influenza ("flu") and tetanus ("Tdap") vaccines in her left deltoid on October 23, 2019. Second Amended Petition at 1, ¶¶ 2, 18.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] On January 6 and July 8, 2022, Petitioner filed amended petitions with additional detail (particularly regarding the multiple vaccines she received) and medical records citations. ECF Nos. 17, 22.

For the reasons discussed below, I find the onset of Petitioner's left shoulder pain likely occurred within 48 hours of vaccination. But her Table SIRVA claim possesses other deficiencies, related to symptoms location and the existence of viable alternative causes for those symptoms. To establish that she is entitlement to compensation, Petitioner will need to prove causation – and will undoubtedly require expert testimony to do so.[4]

## I.    Relevant Procedural History

Due to the then-potential removal of SIRVA from the Vaccine Program's injury table,[5] and the concomitant need for counsel to act quickly in order to protect possibly-legitimate claims, Ms. Clairmy filed a cursory Petition, accompanied only by declarations from herself and Petitioner's counsel.[6] Over the subsequent seven months, Petitioner provided the medical records required by the Vaccine Act. Exs. 3-7, ECF Nos. 8, 11; *see* Section 11(c). On November 2, 2021, the case was activated and assigned to the "Special Processing Unit" (OSM's adjudicatory system for resolution of cases deemed likely to settle, and commonly referred to as SPU). ECF No. 14.

While awaiting Respondent's medical review, Petitioner provided further documentation clarifying that she received three vaccines, all covered by the Vaccine Program - the flu and Tdap vaccines in her *left* arm, and the pneumococcal conjugate vaccine in her *right* arm. Ex. 8, ECF No. 24 (supplement declaration signed under penalty of perjury pursuant to 28 U.S.C.A. § 1746); Ex. 9, ECF No. 25 (documentation from the

---

[4] *See Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (setting out the three-pronged test which must be met to establish causation). If determined to be a significant aggravation claim, three additional factors are required. *Loving ex rel. Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135 (2009) (setting out the six-pronged test which must be met for a significant aggravation claim).

[5] On July 20, 2020, the Secretary of Health and Human Services proposed the removal of SIRVA from the Vaccine Injury Table. National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Proposed Rule, 85 Fed. Reg. 43794 (July 20, 2020). The proposed rule was finalized six months later. National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Final Rule, 86 Fed. Reg. 6249 (Jan. 21, 2021). Approximately one month later, the effective date for the final rule was delayed. National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Delay of Effective Date, 86 Fed. Reg. 10835 (Feb. 23, 2021) (delaying the effective date of the final rule until April 23, 2021). On April 22, 2021, the final rule removing SIRVA from the Vaccine Table was rescinded. National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Withdrawal of Final Rule, 86 Fed. Reg. 21209 (Apr. 22, 2021).

[6] In these declarations (signed under penalty of perjury as required by 28 U.S.C.A. § 1746), Petitioner addressed the basic requirements of the Vaccine Act (Ex. 1) and Petitioner's counsel addressed the expedited filing of the Petition (Ex. 2). Specifically, Petitioner's counsel stated the Petition was being filed prematurely without medical records, "[d]ue to the potential Table amendment proposed by [R]espondent, which would divest victims of shoulder injuries related to vaccine administration (SIRVA) the benefit of a 'Table' claim." Ex. 2 at ¶ 1.

pharmacy); *see* 42 C.F.R. § 100.3(a) (the latest version of the Vaccine Injury Table which includes these vaccines). Petitioner also conveyed a demand to Respondent. Status Report, ECF No. 23.

After Respondent expressed a willingness to engage in settlement discussions, the parties exchanged multiple offers and counteroffers.[7] *See,* e.g., Status Report, filed Dec. 19, 2022, ECF No. 29; Status Report, filed Feb. 17, 2023, ECF No. 37. However, they reached an impasse after only a few months. Joint Status Report, filed Feb. 21, 2023, ECF No. 38. Petitioner also worked to provide updated medical records and other evidence[8] related to her ongoing treatment throughout 2023, and early 2024. Exs. 10-17, ECF Nos. 34-36, 43, 45, 55, 57, 65.

On January 26, 2024, Respondent filed his Rule 4(c) Report, opposing compensation. ECF No. 66. Specifically, he contends Petitioner has failed to provide the preponderant evidence needed to show the required pain onset, symptom location, and lack of a viable alternative cause. *Id.* at 7-8 (citing 42 C.F.R. § 100.3(c)(10)(ii)-(iv)). Respondent also requested multiple medical records which he believed were outstanding. Rule 4(c) Report at 2 n.2, 4 n.3, 5n. 4. During the subsequent fourteen months, Petitioner provided some of these medical records, as well as evidence that some records may not exist. Exs. 18, 20-21,[9] ECF Nos. 68, 72, 74.

## II.   Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy

---

[7] Due to a misunderstanding related to my practice of allowing petitioners to file a motion for a ruling on the record if the case was pending in SPU for more than one year without completion of Respondent's medical review, Petitioner filed a motion requesting that I find her entitled to compensation on January 4, 2023. ECF No. 31. Although she preemptively addressed the requirements for entitlement in a cursory manner, without any information regarding Respondent's specific objections, I considered the arguments set forth in this motion when making my current findings.

[8] All declarations were signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exs. 10, 17.

[9] The additional supplemental declaration provided was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Ex. 18. And no Exhibit 19 was filed, despite an entry on the Exhibit List, titled "Southwest Health Associates Reply to Subpoena". *See,* e.g., Exhibit List, ECF No. 74-1.

has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### III.    Findings of Fact

I make the following findings related to pain onset, symptom location, and potential viable alternative causes after a complete review of the record to include all medical records, affidavits or declarations, and additional evidence filed. Specifically, I highlight the following evidence:

- Prior to vaccination, Ms. Clairmy (age 65 at the time of vaccination) had a prior medical history including common illnesses, allergies, alopecia, hypertension, hyperlipidemia, neuropathic pain, high blood pressure and cholesterol. Ex. 6 at 22-39. She complained of lower leg and back pain in late 2015, and overall pain in 2016, for which she was prescribed Neurontin. *Id.* at 29, 35-36. Even at visits when Petitioner complained of back and leg pain, the record contained the usual entry: "Musculoskeletal: No joint or back pain or muscle problems." *Id.* at 35.

- On October 23, 2019, Petitioner received the flu, Tdap, and pneumococcal conjugate vaccines. Ex. 3 at 4-10. Although the vaccine administration record contains some unclear information related to situs, there are entries suggesting that Petitioner received the flu and Tdap vaccines in her *left* arm, and the pneumococcal conjugate vaccine in her *right* arm.[10] Additionally, these same designations were added as handwritten notations in a later provided copy of the list of the three vaccines. Ex. 9.

- Approximately eight weeks later, on December 18, 2019, Petitioner had a physical exam with her primary care physician ("PCP"). Ex. 6 at 20. He noted that Petitioner was "[d]oing well, [had] no current complaints." *Id.* Again, this record contained the common entry "Musculoskeletal: No joint or back pain or muscle problems." *Id.* The PCP prescribed 500 milligrams

---

[10] Although both option (L and R) were circled on the duplicate consent forms submitted, there is a "L" handwritten next to the details related to the flu and Tdap vaccines and an "R" handwritten next to the details related to the pneumococcal conjugate vaccine. Ex. 3 at 7, 9.

- of Naproxen twice daily, ordered a mammogram and bone density testing, and recommended Petitioner schedule appointments for a colonoscopy and ophthalmology evaluation. *Id.* at 21. There is no entry in this original record stating why the Naproxen was prescribed.

- On January 7, 2020, Petitioner returned for a follow-up appointment with "[l]eft arm pain" listed as the main concern. Ex. 6 at 18.  and Petitioner *Id.* She "state[d] that she got [] a flu injection and her arm has been hurting since then," and the Naproxen prescribed at "her last viist . . . [wa]s not helping her much." *Id.* This record includes the same usual entry: "Musculoskeletal: No joint or back pain or muscle problems," seen in prior records. *Id.* The PCP opined that Petitioner's "[p]ain appears to be neuropathic in nature" and provided her with a neurologic referral for further evaluation. *Id.* at 19.

- In a later-provided version of the record from this December 18, 2019 visit, the PCP added an addendum stating that the Naproxen was prescribed to treat Petitioner's complaint of left shoulder pain. Ex. 21 at 8. The PCP stated that the addendum was based upon the information contained in the record from Petitioner's January 7, 2020 visit. *Id.*

- Petitioner returned to her PCP on January 24, 2020, and February 3, 2020, for continuing left arm pain. Ex. 6 at 14-17. At both appointments, the PCP renewed his referral to a neurologist and prescribed 50 milligrams of Tramadol. *Id* at 17.

- On February 6, 2020, Petitioner presented to a neurologist at the Memorial Neurological Association ("MNA") for evaluation of "left arm pain and weakness" with an onset "on or about the 23[rd] of October 2019 following flu vaccine, tetanus vaccine and pneumonia vaccine." Ex. 7 at 3. Recalling that "[s]he had two shots in the left arm and one shot in the right," she acknowledged that she "does not know which was which." *Id.*

- At this initial neurology appointment, Petitioner described "severe pain that radiates from the left neck to the left shoulder along the lateral aspect of the left arm down to all fingers of the left hand," causing a decreased use of her left hand. Ex. 7 at 3. Characterizing her pain as more severe than childbirth, Petitioner reported that the prescribed medications (Naprosyn, Tramadol, and Gabapentin) were all ineffective. *Id.* It was noted that she was taking 300 milligrams of Gabapentin. *Id.* at 4.

6

- Upon examination, the MNA neurologist observed "give away weakness in the left upper extremity" which prevented an accurate strength assessment. Ex. 7 at 5. He assessed Petitioner as experiencing "radicular pain in the left upper extremity" and ordered testing (x-rays, an MRI, and EMG) to rule out cervical radiculopathy. *Id.* at 6.

- Based upon her PCP's referral and concern regarding a possible nerve impringement, Petitioner was seen by a second neurologist at Houston Methodist Sugar Land Neurology ("HMSLNA") on March 3, 2020, for a complaint of left shoulder pain for five months. Ex. 4 at 76. Reporting more severe pain at night and only slight relief from Gabapentin, Petitioner estimated that her daytime pain was four to five out of ten. She added that her pain "would sometimes radiate from the deltoid down the upper arm and into the forearm and back of left hand." *Id.*

- Observing normal strength in the upper extremities and weakness only in Petitioner's left hand, the HMSLNA neurologist ordered MRIs of the brain and left shoulder, x-rays of the cervical spine, and an EMG; instructed to continue taking Gabapentin, and prescribed meloxicam to be taken as needed. Ex. 4 at 80. He also noted that Petitioner had not been seen by an orthopedist or undergone testing. *Id.*

- The EMG (performed on March 10, 2020) yielded normal results, with "no electrophysiological evidence of an entrapment neuropathy or left cervical radiculopathy." Ex. 4 at 68.

- On March 23 and April 1, 2020, Petitioner sought medication refills from the HMSLNA neurologist. Ex. 4 at 51-62.

- On April 3, 2020, Petitioner participated in a telephonic appointment[11] with the HMSLNA neurologist, during which they discussed the results of her recent EMG and left shoulder MRI. Ex. 4 at 40. Unlike the EMG, the MRI revealed rotator cuff tendinosis, excessive labrum tearing, moderate to severe glenohumeral cartilage deterioration, and moderate effusion with synovitis. The neurologist opined Petitioner's "symptoms [we]re related to structural issues with the left shoulder as described in the MRI" and recommended that she see an orthopedist and possibly pain specialist. *Id.* In response to Petitioner's statement that the prescribed Gabapentin was

---

[11] During this time, many of Petitioner's appointments were conducted telephonically due to the worldwide COVID pandemic. *See* https://www.cdc.gov/museum/timeline/covid19.html (last visited Nov. 21, 2025) (for a pandemic timeline).

7

helping alleviate her pain, the neurologist increased her dosage slightly and ordered a brain MRI "given abnormalities noted on the neurological exam." *Id.*

- On May 28, 2020, Petitioner participated in a telephonic appointment with her PCP for a refill of her current medications. Ex 6 at 12-13.

- During another telephonic appointment with the HMSLNA neurologist held on July 22, 2020, Petitioner reported that she had not yet seen an orthopedist and was delaying her brain MRI due to safety concerns related to the COVID Pandemic. Ex. 4 at 28. However, she stated that she saw an orthopedic *surgeon* who diagnosed her with frozen shoulder, administered an injection, and referred her to physical therapy ("PT") which she found helpful. *Id.* She added that the orthopedic surgeon did not recommend surgery. *Id.*

- Later-provided insurance statements contain entries related to PT visits on July 21, 23, and 30, 2020. Ex. 13 at 39. However, there are multiple entries for each day and notations showing at least several entries may be due to billing errors. *Id.*

- On July 23, 2020, Petitioner had a telephonic appointment with her PCP, seeking medication refills and an orthopedic referral. Ex. 6 at 10-11.

- On August 7, 2020, Petitioner was seen by an orthopedist at UT Physicians for left shoulder pain, reporting that it began "after a vaccination." Ex. 5 at 93. Characterizing her pain as sharp, stabbing, throbbing, and intermittent, Petitioner rated its severity as "5-6 with rest" and "7-8 with activities after attending therapy & etc…" *Id.* It was noted that Petitioner's PCP had diagnosed her with adhesive capsulitis and referred her for a cortisone injection and PT. *Id.* at 89. Remarking that Petitioner "already tried [a] cortisone injection and multiple rounds of physical therapy and [wa]s failing to improve," the orthopedist discussed all potential alternatives, adding that Petitioner had chosen arthroscopic surgery and follow-up PT. *Id.* at 92.

- On September 10, 2020, Petitioner underwent left shoulder arthroscopic surgery. Ex. 5 at 47. In the post operative report, the surgeon stated that

> [t]he glenohumeral joint was in suprisingly very poor condition. The humeral head essentially had large chondral flals and almost full-thickness cartilage loss

8

> over about 70% of the humeral head. The posterior 50% of the hemisphere was dented in, as if she had [] a prior anterior dislocation or possibly just as a result of severe arthritis. The glenoid also had cartilage damage. . . . Biceps tendon was in good condition. There was degenrative labral tearing throughout. . . . The rotator cuff was all intact . . . and required no repair.

*Id* at 53. He also observed "significant bursitis" in subacromial space. *Id.*

- After the procedure, Petitioner had difficulty awaking from the anesthia, prompting medical staff to administer stroke and seizure precautions, including doses of Narcan, Keppera, and Ativan, and a CT and MRI of the brain were performed. Ex. 5 at 40. She tested negative for stroke and seizure and eventually woke without incident. *Id.* Petitioner's post-operative diagnoses included left shoulder adhesive capsulitis and glenohumeral arthritis. *Id.* at 56. She was discharged from the hospital two days later on September 12, 2020. *Id.*

- Three days later, on September 15, 2019, Petitioner began post operative PT. Ex. 5 at 18. She reported that her shoulder was feeling better, but she continued to experience pain and difficulty reaching overhead and behind her back. *Id.* Petitioner estimated her pain as two at best and five at worst. *Id.*

- On September 18, 2020, Petitioner had a follow up appointment with her orthopedist. Ex. 5 at 36. The orthopedist noted Petitioner was "looking and feeling great right now [but] [s]he did have severe signs of left shoulder arthritis at the time of the arthroscopy." *Id.* Noting that he "went over all this" with Petitioner, the orthopedist stated that Petitioner would "follow-up as needed and let us know when the pain returns." *Id.*

- Between September 15 and October 16, 2020, Petitioner attended 16 PT sessions. Ex. 5 at 20. At her final visit, she reported improvement in her range of motion ("ROM") but continued pain when reaching. *Id.* She estimated a pain severity of two to three. *Id.*

- On November 13, 2020, Petitioner returned to PT "for the first time in 4 weeks" due to a delay while awaiting her insurance authorization. Ex. 5 at

9

39. She reported "having more pain over the past 3 weeks" and a lack of relief with medication. *Id.* She estimated a pain severity between three to five.

- At her orthopedic follow-up appointment three days later, Petitioner again recounted a worsening of her symptoms three weeks ago, rating her pain as five out of ten. Ex. 5 at 13. Reporting that she "[wa]s still attending [PT] twice a week and home exercises daily," she described pain that was "located diffusely around the shoulder, . . . characterized as throbbing and burning." *Id.* Upon examination, the orthopedist observed lost ROM, both internally and externally. *Id.* at 16. He administered a steroid injection, prescribed meloxicam, and recommended Petitioner continue PT and home exercises. *Id.*

- At her next orthopedic appointment on December 7, 2020, Petitioner reported that "she [wa]s doing okay since surgical intervention, . . . experiencing mild-moderate pain post operatively, . . . [and] attending physical therapy 2 times a week." Ex. 5 at 7. Rating her current pain severity as five, she stated that the "cortisone injection a month ago . . . gave her relief for only 2 to 3 days." *Id.*

- Upon examination, the orthopedist noted pain, tenderness, and "decreased range of motion as expected for [her] level of arthritis." Ex. 5 at 10. He stated that the "arthroscopy done about 3 months ago . . . showed surprisingly severe arthritis in the glenohumeral joint [and] [s]he has not really improved at all and continues to have pain at her wrist." *Id.* It was noted that Petitioner "ha[d] tried 2 cortisone injections which really g[a]ve her only 2 to 3 days of relief. *Id.* Afte discussing all options with the orthopedist, Petitioner opted for a complete shoulder replacement. *Id.*

- No further medical records were provided in support of Petitioner's claim.

- In her first signed declaration (filed on January 12, 2021), Petitioner addressed the basic requirements of the Vaccine Act. Ex. 1. She discussed the three vaccines received on October 23, 2019, in her second and third declarations, filed in July 2022, and February 2024, respectively. Exs. 8, 18.

- In her third declaration, Petitioner also addressed any future treatment, noting that she "did not want to undergo the procedure recommended by [her] doctor" (Ex. 18 at ¶ 10), because she "knew people that have undergone shoulder replacement surgery, and it did not alleviate their pain

10

(*id.* at ¶ 11). Although she stated that she "still ha[s] occasional pain, [she] ha[d] not sought treatment for her shoulder injury since December 2020." *Id.* at ¶ 13.

### A. Specific Pain Onset Finding

Respondent bases his contention that Petitioner has failed to establish two-day pain onset upon the lack of any mention of left shoulder pain in the initially-provided medical record from the PCP visit for a physical in December 2019, approximately eight weeks post-vaccination, and Petitioner's description of pain onset *since* vaccination which he insists is vague. Rule 4(c) Report at 7. I do not, however, find either argument to be persuasive.

I have previously rejected Respondent's characterization of the term "since" as impermissibly vague for purposes of onset determinations. *See,* e.g., *Merwitz v. Sec'y of Health & Hum. Servs.,* No. 20-1141V, 2022 WL 17820768, at *3 (Fed. Cl. Spec. Mstr. Oct. 11, 2022). Instead, I have found that definitions for that term include the following, which support an immediate pain onset: 1) "from a definite past time until now" and 2) "from a particular time in the past until a later time."[12] This is, therefore, not strong grounds for an adverse onset finding.

Respondent's contention about omissions of pain complaints in certain records is also unavailing. Although Respondent fairly observes the lack of any entry related to left shoulder pain in the original version of the record from Petitioner's December 18, 2019 visit, there is sufficient evidence to counter this omission. In the record from Petitioner's next visit (January 8, 2020), the PCP clearly stated he prescribed Naproxen in December 2019 to treat her left arm pain - present since the flu vaccine. Ex. 6 at 19. And the entry in the December 2019 record stating that Petitioner was not experiencing any joint or back pain is not reliable, as it can be found in most PCP records even when back and lower leg pain was specifically mentioned and treated. *Compare* Ex. 6 at 35 (October 30, 2015 record) *with id.* at 20 (December 18, 2019 record). Furthermore, the PCP agreed that Petitioner's complaint of left shoulder pain was mistakenly omitted by later amending the December 2019 record. Ex. 21 at 8.

As clarified in *Kirby,* the Federal Circuit's holding in *Cucuras* should not be interpreted to mean that all medical records are presumed to be complete. *Kirby,* 997

---

[12] These definitions can be viewed at the Merriam-Webster and Cambridge Dictionary. *See* (www.merriam-webster.com/dictionary/since; https://dictionary.cambridge.org/us/dictionary/english/since (last visited on Nov. 17, 2025).

F.3d at 1382-83. Rather, the Circuit "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Id.* at 1383.

In this case, Petitioner consistently attributed her left shoulder pain to the vaccines she received on October 23, 2019, when seeking treatment throughout 2020. Ex. 6 at 18; Ex. 7 at 3; Ex. 5 at 93 (in chronologic order). While these entries were based upon information provided by Petitioner, and reflect her belief that these events were linked, they do provide some evidence supporting the pain onset that she alleges. And they still should be afforded greater weight than more current representations, as they were uttered contemporaneously with Petitioner's injury for the purposes of obtaining medical care.[13]

Because the preponderant evidence favors an immediate pain onset, I find that Petitioner has satisfied this Table SIRVA onset requirement.

### B. Symptom Location and Viable Alternative Causes

Despite my finding related to pain onset, the record as it currently stands does not support certain Table elements - specifically those related to symptom location and the lack of a viable alternative cause. *See* 42 C.F.R. § 100.3(c)(10)(iii)-(v). The symptoms Petitioner reported were often atypical and located in areas such as her neck and hand. *See,* e.g., Ex. 7 at 3. And there is amble evidence showing two viable alternatives for Petitioner's symptoms – the severe arthritis and labral tear noted on the MRI and during arthroscopic surgery. Ex. 4 at 40; Ex. 5 at 53.

A petitioner will fail to satisfy the fourth QAI criteria if there is preponderant evidence of a condition that *would* explain the petitioner's current symptoms. *See* 42 C.F.R. § 100.3(c)(10)(iv). The condition or abnormality must qualify as an explanation for the symptoms a petitioner is experiencing, but need not be a better or more likely explanation. *Durham v. Sec'y of Health & Hum Servs.,* No. 17-1899V, 2023 WL 3196229, at *13-14 (Fed. Cl. Spec. Mstr. Apr. 7, 2023). In effect, and although the same preponderant evidentiary burden applies to this QAI as with all others, this Table element does not impose on Respondent the obligation to prove an "alternative cause" for the injury, but instead merely requires him to demonstrate that the record contains sufficient

---

[13] The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras,* 993 F.2d at 1528 (emphasis added). Thus, the Circuit has instructed that information provided by Petitioner to a treater and contained in a contemporaneous record deserves weight, and should not be considered subjective merely because it *came* from a patient, rather than physician.

12

evidence of a competing explanation to "muddy" a preponderate fact finding that vaccine administration was the cause.[14] The relevant inquiry is whether the condition or abnormality "wholly explains [a petitioner's] symptoms independent of vaccination." *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-0995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020).

There are numerous SPU cases in which I have dismissed a petitioner's Table claim after determining this requirement had not been satisfied. *See, e.g., Miller v. Sec'y of Health & Hum. Servs.,* No. 20-0531V, 2024 WL 3699521 (Fed. Cl. Spec. Mstr. July 9, 2024); *Lindsey v. Sec'y of Health & Hum. Servs.,* No. 20-1650V, 2023 WL 4858539 (Fed. Cl. Spec. Mstr. June 29, 2023). And other special master have also dismissed claims in total after further litigation. *Pulsipher v. Sec'y of Health & Hum. Servs.,* No. 21-2133V, issued on Apr. 24, 2025 (available on the Court's website as of May, 9, 2025). And that outcome is possible here, since the record as it currently stands does not support the fourth QAI requirement. It is otherwise unlikely that she will be able establish that the significant arthritis and degenerative changes observed by her orthopedist would not explain her symptoms.

## IV. Order to Show Cause

Petitioner's Table SIRVA claim will fail unless she offers sufficient evidence (to date not filed) to meet the third and fourth QAI criteria. And I note that on multiple occasions, she has been ordered to provide medical records which appear to be outstanding. There are multiple entries, to several different providers, referencing treatment undergone in late Spring 2020, specifically a steroid injection and PT. Ex. 4 at 28; Ex. 5 at 92; *see also* Ex. 5 at 10 (referencing *two* steroid injections, rather than one). Although these entries may be based upon erroneous information provided by Petitioner at that time, the recounted details are strikingly similar. At a minimum, Petitioner should provide another affidavit or sworn declaration addressing these entries, and the question whether there are some medical records still outstanding.

I am giving Petitioner a final chance to obtain and file such evidence – and it is important she take that chance seriously. Failure to provide this evidence will result in dismissal of Petitioner's Table claim. *Tsekouras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 439 (1992), aff'd, 991 F.2d 810 (Fed. Cir. 1993) (per curiam); *Sapharas v. Sec'y of Health & Human Servs.*, 35 Fed. Cl. 503 (1996); Vaccine Rule 21(b).

---

[14] Of course, claims that are styled as a SIRVA Table claim but which "fall out" may still remain viable as a causation claim – and in such circumstances the usual considerations applicable to "factor unrelated" alternative causes, and the shifted burden considerations, will come into play. For present purposes, what matters is that this Table element expressly requires the *petitioner* to show no other "condition or abnormality."

13

However, there is sufficient evidence to suggest that regardless of the disposition of the Table claim, a non-Table claim is likely viable, but will require going to the expense of obtaining experts to support each party's position. And, given the existence of unrelated conditions which may have caused symptoms contributing to Petitioner's pain and suffering, even if successful, any compensation awarded would be limited to those symptoms shown to be vaccine-related, and may not be as substantial as Petitioner envisions. Thus, I would encourage the parties to renew their settlement discussions to determine if an informal agreement can be reached.

**The parties shall file a joint status report updating me on their renewed settlement discussions and Petitioner's effort to provide at least the medical records that appear to be outstanding by no later than <u>Tuesday, January 06, 2026</u>**.

**If the parties' renewed settlement discussions are unsuccessful, and Petitioner wishes to continue with her Table SIRVA claim, she must file all outstanding medical records (or sufficient evidence establishing that the record is complete) and provide the preponderant evidence needed to satisfy the third and fourth Table criteria, or to otherwise show cause why her Table SIRVA claim should not be dismissed by no later than <u>Monday, February 09, 2026</u>.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master